**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JUAN MARTINEZ and MARIA GABRIELA ARAUZO, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE GOURMET FACTORY, INC.,<br><br>Defendant. | Civil Action No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Juan Martinez and Maria Gabriela Arauzo ("Plaintiffs"), by and through their attorneys, make the following allegations against Defendant The Gourmet Factory, Inc. ("Defendant" or "Gourmet Factory") pursuant to the investigations of their counsel and upon information and belief, except as to the allegations specifically pertaining to themselves or their counsel, which are based upon personal knowledge.

## INTRODUCTION

1. This is a class action on behalf of purchasers of (1) Capatriti "100% Pure Olive Oil" (the "100% Pure Product") and (2) Capatriti "Extra Virgin Olive Oil" (the "Extra Virgin Product") (collectively, the "Products" or "Capatriti") in the United States.

2. Defendant markets, labels, advertises, and sells the Products to consumers with packaging that prominently and unequivocally represents that the oil is "100% Pure" or "Extra Virgin Olive Oil," respectively.

3. Reasonable consumers believe, based on Defendant's representation, that the Products are pure olive oil. However, independent laboratory testing has shown that the Products are adulterated with olive pomace oil ("pomace").

4. Pomace is an ultra-processed byproduct extracted from leftover olive skins and pits, typically using a combination of chemical solvents and high temperatures. Although it comes from olives, pomace is *not* olive oil and the refining process required after extraction it renders it flavorless and odorless.

5. More importantly, pomace is sold at far lower prices than authentic olive oils, whether they are extra virgin or regular olive oil products:

| Brand | Quantity | Price | Unit Price |
|---|---|---|---|
| **Capatriti 100% Pure Olive Oil[1]** | **68 fl. oz.** | **$35.99** | **$0.53 per fl. oz.** |
| **Capatriti Extra Virgin Olive Oil[2]** | **68 fl. oz.** | **$35.99** | **$0.53 per fl. oz.** |
| Botticelli Extra Virgin Olive Oil[3] | 50.7 fl. oz. | $26.99 | $0.53 per fl. oz. |
| Filippo Berio Olive Oil[4] | 50.7 fl. oz. | $44.99 | $.89 per fl. oz. |
| Olio Villa Blended Pomace Oil[5] | 128 fl. oz. | $19.99 | $.16 per fl. oz. |

[1]https://www.instacart.com/products/141321-capatriti-100-pure-olive-oil-68-fl-oz?retailerSlug=compare-fresh-golden-pineapple.

[2]https://www.instacart.com/products/141320-capatriti-extra-virgin-olive-oil-68-fl-oz?retailerSlug=compare-fresh-golden-pineapple.

[3]https://www.instacart.com/products/310697-botticelli-olive-oil-extra-virgin-50-7-oz?retailerSlug=compare-fresh-golden-pineapple.

[4] https://www.instacart.com/products/69166-filippo-berio-olive-oil-extra-virgin-50-7-oz?retailerSlug=compare-fresh-golden-pineapple.

[5]https://www.instacart.com/products/16787453-olio-villa-olio-villa-vegetable-oil-enriched-with-extra-virgin-olive-oil-128-oz?retailerSlug=compare-fresh-golden-pineapple.

6. Calling a product "olive oil" when it contains any other non-olive oil is barred by an array of olive oil-making conventions, standard industry practices, international regulations, and federal and state laws. According to several authorities, a product containing more than a negligible amount of other oils must contain a prominent disclosure of that fact on the label. Defendant does not disclose its use of pomace and instead misleads purchasers as to the nature of its Products by, among other things, disguising adulterated olive oil as "100% Pure Olive Oil" or "Extra Virgin Olive Oil."

7. Defendant's misbranding is intentional. Any reasonable quality-control check would detect the presence of other oils. A packer or distributor of olive oils therefore does not unwittingly mislabel adulterated olive oil as olive oil.

8. Making matters worse, Defendant expressly offers a product called "Capatriti Blended Canola Oil And Extra Virgin Olive Oil." Thus, consumers would not expect the Products, which purport to be solely olive oil, to be blended with other oils.

9. This is not Defendant's first rodeo. In 2013, Defendant admitted to adulterating Capatriti 100% Pure Olive Oil with pomace oil.[6] In fact, Defendant's President, Themis Kangadis, stated in a sworn affidavit that **the product contained no olive oil at all** – it was 100% pomace oil. As he explained, "Capatriti … is not an 'olive oil mixture' with 'different ingredients,' as it contains only Olive-Pomace Oil."[7]

10. In a related class action against Defendant, Judge Rakoff found that "numerous industry standards and the like distinguish pomace oil from olive oil" and therefore olive-pomace

[6] Affidavit in Opposition to Plaintiff's Application For a Preliminary Injunction, *North American Olive Oil Association v. Kangadis Food, Inc.*, No. 13-cv-0868 (S.D.N.Y. Mar. 20, 2013), ECF no. 15.

[7] *Id.*

oil cannot be labeled as pure olive oil.[8] Therefore, Defendant is fully aware that a product containing any amount of pomace cannot be sold as pure olive oil.

11. The mislabeling of the Products render them completely worthless. By mislabeling the Products, Defendant dupes consumers into purchasing something that is *not* olive oil. Nevertheless, the Products are labeled and sold as premium olive oil, and they command a substantial price premium over blended pomace oils.

12. Plaintiffs seek relief in this action individually, and on behalf of all other similarly situated individuals who purchased the falsely and deceptively labeled Products during the statute of limitations period, for violation of New York General Business Law ("GBL") §§ 349-350, breach of express warranty, and fraud.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

14. This Court has general personal jurisdiction over Defendant because its principal place of business is in New York and is thus at home in New York.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District. Specifically, Plaintiffs purchased the Products in this District.

[8] *Ebin v. Kangadis Food Inc.*, 2014 WL 737878 at *2 (S.D.N.Y. Feb. 25, 2014).

## PARTIES

16. Plaintiff Juan Martinez is an individual consumer who, at all times material hereto, was a citizen of The Bronx, New York. Mr. Martinez purchased the 100% Pure Product from Compare Fresh which is located in The Bronx, New York in or around September 2025. Plaintiff Martinez paid approximately $35 for the 100% Pure Product. Plaintiff Martinez saw and relied on Defendant's representations in making his purchase. Plaintiff Martinez reasonably believed, based on the representations, that he was purchasing unadulterated olive oil, and this belief was a material part of his decision to purchase the 100% Pure Product. However, upon using the 100% Pure Product, Plaintiff Martinez discovered that the 100% Pure Product was flavorless and odorless and looked different from other pure olive oil products he had purchased in the past. Therefore, he discarded the container before finishing it and had to purchase a new, more expensive olive oil container. Had Plaintiff Martinez known that the 100% Pure Product was adulterated with pomace and was not unadulterated olive oil, he would not have purchased it, or he would have paid less for it. Thus, Plaintiff Martinez has suffered an injury in fact and lost money as a result of Defendant's misleading, false, unfair, and deceptive practices, as alleged herein.

17. Plaintiff Maria Gabriela Arauzo is an individual consumer who, at all times material hereto, was a citizen of New York, New York. Ms. Arauzo purchased the Extra Virgin Product from a Key Foods Supermarket in New York, New York in or around December 2025. Plaintiff Arauzo paid approximately $35 for the Extra Virgin Product. Plaintiff Arauzo saw and relied on Defendant's representations in making her purchase. Plaintiff Arauzo reasonably believed, based on the representations, that she was purchasing unadulterated extra virgin olive oil—a product that is minimally processed without the use of high heat or chemicals, and this belief was a material part of her decision to purchase the Extra Virgin Product. However, upon

using the Extra Virgin Product, Plaintiff Arauzo discovered that the Extra Virgin Product was flavorless and looked different from other extra virgin olive oil products she had purchased in the past. Had Plaintiff Arauzo known that the Extra Virgin Product was adulterated with pomace and was not extra virgin olive oil, she would not have purchased it, or she would have paid less for it. Thus, Plaintiff Arauzo has suffered an injury in fact and lost money as a result of Defendant's misleading, false, unfair, and deceptive practices, as alleged herein

18. Defendant The Gourmet Factory, LLC is a New York corporation with its principal place of business at 55 Corporate Drive, Hauppauge, New York, United States, 11788.

19. Defendant manufactures, markets, and distributes the Products throughout New York and the United States.

## FACTUAL ALLEGATIONS

### A. Laws, Regulations, and Industry Standards Do Not Permit Adulterated Oil to be Labeled as Olive Oil

20. Virgin olive oil is defined as "oils which are obtained from the fruit of the olive tree (*Olea europaea L.*) solely by mechanical or other physical means under conditions, particularly thermal conditions, that do not lead to alterations in the oil, and which have not undergone any treatment other than washing, decantation, centrifugation and filtration."[9]

21. In contrast, Pomace is an ultra- processed industrial fat typically derived by "treating olive pomace (the product remaining after the mechanical extraction of olive oil) with solvents or other physical treatments[.]" *See* 75 Fed. Reg. 22363 (Apr. 28, 2010). The cost of producing oil in this manner is a fraction of the cost of producing olive oil. Although Pomace can sometimes be refined or mixed with olive oil to make it fit for human consumption, no

[9] International Olive Council, Trade Standard Applying to Olive Oils and Olive-Pomace Oils, COI/T.15/NCNo.3/Rev 21 at 2.1.1 (July 2025). (the "IOC Trade Standards").

recognized regulatory body or organization in the world permits Pomace or products containing Pomace to be passed off as "olive oil."

22. Despite vigilant policing by responsible industry members, the cost disparities between olive oil and other vegetable oils nevertheless create a financial incentive for fraudsters to adulterate olive oils with cheaper oils (such as pomace) and disguise it as olive oil.

23. Various federal and international bodies have promulgated standards to guard against deceptive mislabeling, including standards to distinguish olive oil from pomace and other seed oils. Relevant here are three regulatory bodies: the USDA, the International Olive Council, and the New York State Legislature. They have adopted standards that reflect the longstanding industry practices that underlie relevant consumer expectations.

24. The USDA has promulgated the following definition for classifying olive derived oils:

> Virgin olive oils are the oils obtained from the fruit of the olive tree solely by mechanical or other physical means under conditions, including thermal conditions, that do not lead to alterations in the oil, and which have not undergone any treatment other than washing, decantation, centrifugation, and filtration … No additives of any kind are permitted.

75 Fed. Reg. 22363 (Apr. 28, 2010)

25. Similarly, under New York law, "olive oil" is defined as the oil "obtained solely from the fruit of the olive tree (olea europaea), to the exclusion of oils obtained using solvents or reesterification processes and of any mixture with oils of other kinds." N.Y. Agric. & Mkts. Law § 204-a(l)(a). "[R]efined olive oil" is the "olive oil obtained from virgin olive oils by refining methods which do not lead to alterations in the initial glyceridic structure. It has free acidity, expressed as oleic acid, of not more than 0.3 grams per hundred grams." *Id.* § 204-a(l)(c). "Olive-pomace oil" is "oil obtained by treating olive pomace with solvents or other physical treatments." *Id.* § 204-a(l)(b).

26. New York's legislature has made it "unlawful for any person to manufacture, pack, possess, sell, offer for sale, and/or expose for sale any compound or blended oil of any kind which purports to be an olive oil mixture unless the container thereof be permanently and conspicuously labeled 'compound oil' or 'blended oil' with a statement of the different ingredients thereof and the specific percentage of olive oil, the total percentage of other vegetable oils and the specific percentage of each other ingredient comprising more than one half of one per centum of the mixture." *Id.* §204-a.

27. "Failure to meet the[se] standards ... shall render olive oil sold in intrastate commerce in the state misbranded." *Id.* § 204-a(3)(b).

28. The IOC promulgates world-recognized standards used to determine the quality and purity of olive oils. The IOC actively monitors and seeks to prevent olive oil fraud throughout its member countries. In addition, the IOC has certified a small number of laboratories around the world that meet rigorous guidelines for performing chemical and sensory tests of olive oils. Under IOC standards, no one can label olive oil mixed with pomace as olive oil.[10]

**B. Laboratory Testing Confirms the Products Are Not "Olive Oil"**

29. In early 2025, the North American Olive Oil Association ("NAOOA"), an international trade association of marketers, packagers, and importers of olive oil, retained an independent third party to purchase containers of Capatriti "100% Pure Olive Oil" from store shelves in New York.

30. The independent third party then carefully blinded and shipped a container of the Capatriti "100% Pure Olive Oil" to the Lluis Jané Busquets Labratori d'Anàlisi S.L, an IOC-

[10] IOC Trade Standards 2.1.3.

recognized laboratory located in Sant Quirze del Vallès, Spain.

31. The results demonstrated that the 100% Pure Product, contrary to its label's assertions, is not olive oil. These results are attached as Exhibit A.

32. Based on a number of separate objective chemical criteria, the sample of "100% Pure Olive Oil" was adulterated with pomace. As such, the 100% Pure Product cannot properly be labeled, represented, or commonly understood to be olive oil.

| **Parameter** | **IOC Limit for Olive Oil**[11] | **Capatriti 100% Pure Sample From NAOOA** |
|---|---|---|
| **Wax Content** | <=350 | 3984 mg/Kg |
| **Erythrodial + Uvaol** | <=4.5 | 21.8 |

33. Wax content above the IOC thresholds is a clear indicator that an olive oil has been adulterated with pomace because wax is found in the skin of the olive fruit.[12] Erythrodial + uvaol are also only found in the olive skin and released during the pomace extraction process. [13]

34. These results cannot be blamed on merely poor-quality olive oil or the handling and storage of the particular tin tested. These results simply could not have occurred if this lot of ostensibly "100% Pure Olive Oil" contained only oils extracted from olives exclusively through mechanical methods. In other words, these markers do not appear by happenstance and clearly indicate that the oil is adulterated with pomace.

---

[11] IOC Trade Standards 3.

[12] United States Standard for Grades of Olive Oil and Olive-Pomace Oil, 75 FR 22363 (April 28, 2010).

[13] Jacinto Sánchez Casas, Emilio Osorio Bueno, Alfonso M.Montaño García, Manuel Martinez Cano, Sterol and erythrodiol+uvaol content of virgin olive oils from cultivars of Extremadura (Spain), Food Chemistry, Volume 87, Issue 2, 2004, p. 225-230.

35. In January 2026, the Extra Virgin Product purchased by Plaintiff Arauzo was shipped to the same IOC recognized lab in Spain. Laboratory testing confirmed that the Extra Virgin Product, like the 100% Pure Product tested by NAOOA, was also adulterated with pomace. The results from Plaintiff Arauzo's sample are attached as Exhibit B.

| **Parameter** | **IOC Limit for Olive Oil[14]** | **Capatriti Extra Virgin Olive Oil Sample from Plaintiff Arauzo** |
|---|---|---|
| **Stigmasta-3,5-diene** | <=0,05 | 0.11 |
| **Erythrodial + Uvaol** | <=4.5 | 4.9 |

36. Similar to the 100% Pure Product, levels of erythrodial + uvaol were above the IOC limits indicating the presence of pomace. The sample also contained stimasta-3,5-diene above the IOC thresholds. Levels of this marker above the IOC limit indicate the presence of pomace because stimasta-3,5-diene arises from high temperatures applied during the refining process required to make crude pomace edible before it is mixed with a small amount of virgin olive oil to give it some flavor and color.[15]

**C. Defendant's False and Deceptive Labeling**

37. The Products are generally sold in various container types.

38. On all containers of the 100% Pure Product, the front and back label represents that it is "100% Pure Olive Oil." This text appears in large, vertical letters and is placed adjacent

[14] IOC Trade Standards 3.

[15] Arturo Cert, *Augusto Lanzón, Amalia A. Carelli, Tomás Albi, Giovanni Amelotti, Formation of stigmasta-3,5-diene in vegetable oils*, Food Chemistry, Volume 49, Issue 3, 1994, p. 287-293

to an image of an olive branch:




39. On all containers of the Extra Virgin Product, the front and back label represents that it is "Extra Virgin Olive Oil *the honest olive oil*." This text appears in large, vertical letters and is placed adjacent to an image of an olive branch. Below is an image of the Extra Virgin Product purchased by Plaintiff Arauzo:




40. As can be seen from the above images, Defendant's representations convey the unequivocal message that the Products are authentic olive oils.

41. Defendant does not disclose anywhere that the Products are adulterated with pomace or other oils. Thus, consumers reasonably believe the Products are authentic olive oil.

42. As discussed above, based on Plaintiff's investigation and testing, the Products are not authentic olive oils and are in fact adulterated with pomace. Thus, the claim is false and misleading.

### D. Defendant's Representations Are Material

43. Defendant's representations are material—*i.e.*, it is material to the decision of reasonable consumers to purchase the Products.

44. Olive oil is well-known to be one of the healthiest cooking oils and is extremely popular in the United States due in substantial part because of it is minimally processed, especially virgin olive oils, and therefore substantially lower in trans fats than pomace olive oils that are extracted at high heat with chemical solvents. Furthermore, virgin olive oil has a far superior taste to oil blended with pomace because pomace is nearly flavorless due to the heavy refining process required to produce it.

45. Regardless of whether consumers believe olive oil is superior to other oils, the issue of whether the olive oil is pure or is adulterated is material to reasonable consumers. Consumers of the Products reasonably expect to know what type of oil they are consuming.

46. This is supported by the aforementioned regulations.

47. Consumers purchased, and continue to purchase, the Products in part because Defendant's representations convey the unequivocal message that the Products only contain olive oil. Plaintiffs and Class members would have paid less for the Products, or would not have purchased them at all, if not for these representations. Therefore, Plaintiffs and Class members have suffered a financial injury in the form of paying a price premium that the Products command in the market as a result of Defendant's representations that the Products are olive oil.

## CLASS ALLEGATIONS

48. Plaintiffs bring this class action pursuant to Fed. R. Civ. P. 23, and all other applicable laws and rules, individually, and on behalf of all members of the following Classes:

**<u>Nationwide Class</u>**

> All natural persons who purchased the Products in the United States within the applicable statute of limitations period.

**<u>New York Subclass</u>**

> All natural persons who purchased the Products in the State of New York within the applicable statute of limitations period.

49. Excluded from the Classes are the following individuals and/or entities: Defendant and its parents, subsidiaries, affiliates, officers and directors, current or former employees, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

50. Plaintiffs reserve the right to modify or amend the definition of the proposed Classes and/or add subclasses before the Court determines whether class certification is appropriate.

51. Plaintiffs are members of both classes.

52. <u>Numerosity</u>: The proposed Classes are so numerous that joinder of all members would be impractical. The Products are sold throughout the United States and the State of New York. The number of individuals who purchased the Products during the relevant time period is at least in the tens of thousands. Accordingly, Class members are so numerous that their individual joinder herein is impractical. While the precise number of Class members and their identities are unknown to Plaintiffs at this time, these Class members are identifiable and ascertainable.

53. <u>Common Questions Predominate:</u> There are questions of law and fact common to the proposed Classes that will drive the resolution of this action and will predominate over

questions affecting only individual Class members. These questions include, but are not limited to, the following:

(a) Whether Defendant misrepresented material facts and/or failed to disclose material facts in connection with the packaging, marketing, distribution, and sale of the Products;

(b) Whether Defendant's use of the challenged packaging, constituted false or deceptive advertising;

(c) Whether Defendant engaged in unfair, unlawful and/or fraudulent business practices;

(d) Whether Defendant's unlawful conduct, as alleged herein, was intentional and knowing;

(e) Whether Plaintiffs and the Classes are entitled to damages and/or restitution, and if so, in what amount;

(f) Whether Plaintiffs and the Classes are entitled to statutory damages, and if so, in what amount; and

(g) Whether Plaintiffs and the Classes are entitled to an award of reasonable attorneys' fees, interest, and costs of suit.

54. Defendant has engaged in a common course of conduct giving rise to violations of the legal rights sought to be enforced uniformly by Plaintiffs on behalf of the proposed Classes. Similar or identical statutory and common law violations, business practices, and injuries are involved. The injuries sustained by members of the proposed Classes flow, in each instance, from a common nucleus of operative fact, namely, Defendant's deceptive packaging and advertising of the Products. Each instance of harm suffered by Plaintiffs and Class members has directly resulted from a single course of unlawful conduct. Each Class member has been exposed

to the same deceptive practice, as the packaging of the Products: (a) bear the same material false representations and (b) the Products do not meet this representation of fact. Therefore, individual questions, if any, pale in comparison to the numerous common questions presented in this action.

55. Superiority: Because of the relatively small damages at issue for each individual Class member, no Class member could afford to seek legal redress on an individual basis. Furthermore, individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. A class action is superior to any alternative means of prosecution.

56. Typicality: The representative Plaintiffs' claims are typical of those of the proposed Classes, as all members of the proposed Classes are similarly affected by Defendant's uniform unlawful conduct as alleged herein.

57. Adequacy: Plaintiffs will fairly and adequately protect the interests of the proposed Classes as his interests do not conflict with the interests of the members of the proposed Classes they seek to represent, and they have retained counsel competent and experienced in similar class action litigation. The interests of the members of the Classes will be fairly and adequately protected by the Plaintiffs and their counsel.

58. Defendant has also acted, or failed to act, on grounds generally applicable to Plaintiffs and the proposed Classes, supporting the imposition of uniform relief to ensure compatible standards of conduct toward the members of the Classes.

## CLAIMS FOR RELIEF

### COUNT I
**Violation of the New York General Business Law § 349**
**(On behalf of the New York Subclass)**

59. Plaintiffs incorporate by reference and re-allege herein all paragraphs alleged above.

60. Plaintiffs bring this cause of action on behalf of themselves and members of the New York Subclass against Defendant.

61. Plaintiffs and New York Subclass members are "persons" within the meaning of the GBL § 349(h).

62. Defendant is a "person, firm, corporation or association or agent or employee thereof" within the meaning of GBL § 349(b).

63. Under GBL § 349, "[d]eceptive acts or practices in the conduct of any business, trade or commerce are unlawful."

64. Defendant made false and misleading statements by marketing the Products as "olive oil" when in fact it was adulterated with cheaper oils.

65. In doing so, Defendant engaged in deceptive acts or practices in violation of GBL § 349.

66. Defendant deceptive acts or practices were materially misleading. Defendant's conduct was likely to and did deceive reasonable consumers, including Plaintiffs, about the quality of its Products, as discussed throughout.

67. Plaintiffs and New York Subclass members were unaware of, and lacked a reasonable means of discovering, the material facts that Defendant withheld.

68. Defendant's actions set forth above occurred in the conduct of trade or commerce.

69. The foregoing deceptive acts and practices were directed at consumers.

70. Defendant's misleading conduct concerns widely purchased consumer products and affects the public interest. Defendant's conduct includes unfair and misleading acts or practices that have the capacity to deceive consumers and are harmful to the public at large. Defendant's conduct is misleading in a material way because it fundamentally misrepresents the production and quality of the Products.

71. Plaintiffs and New York Subclass members suffered ascertainable loss as a direct and proximate result of Defendant's GBL violations in that (a) they would not have purchased the Products had they known the truth, and (b) they overpaid for the Products on account of the misrepresentations and omissions, as described herein.

72. On behalf of themselves and other members of the New York Subclass, Plaintiffs seek to enjoin Defendant's unlawful acts and practices described herein, to recover their actual damages or $50, whichever is greater, reasonable attorney's fees and costs, and any other just and proper relief available under GBL § 349.

## COUNT II
## Violation of the New York General Business Law § 350
## (On behalf of the New York Subclass)

73. Plaintiffs incorporate by reference and re-alleges herein all paragraphs alleged above.

74. Plaintiffs bring this claim individually and on behalf of the members of the New York Subclass against Defendant.

75. GBL § 350 provides that "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

76. Defendant's labeling and advertisement of the Products was false and misleading in a material way. Specifically, Defendant advertised the Products as "olive oil" when in fact it was adulterated with cheaper oils.

77. Plaintiffs understood Defendant's misrepresentations to mean that the Products were in fact "olive oil" as reasonable consumers understand the term.

78. This misrepresentation was consumer-oriented and was likely to mislead a reasonable consumer acting reasonably under the circumstances.

79. This misrepresentation has resulted in consumer injury or harm to the public interest.

80. As a result of this misrepresentation, Plaintiffs and New York Subclass members have suffered economic injury because (a) they would not have purchased the Products had they known the truth, and (b) they overpaid for the Products on account of the misrepresentations and omissions, as described herein.

81. By reason of the foregoing and as a result of Defendant's conduct, Plaintiffs and New York Subclass members seek to enjoin the unlawful acts and practices described herein, to recover their actual damages or five hundred dollars, whichever is greater, three times actual damages, reasonable attorneys' fees and costs, and any other just and proper relief available under GBL § 350.

## COUNT III
**Breach of Express Warranty**
**(For all Classes)**

82. Plaintiffs incorporate by reference and re-allege herein all paragraphs alleged above.

83. Plaintiffs bring this claim individually and on behalf of members of the Class and New York Subclass against Defendant.

84. In connection with the sale of the Products, Defendant issued written warranties. Defendant, as the designer, manufacturer, marketer, distributor, and/or seller expressly warranted that the Products were olive oil.

85. Defendant's express warranties and its affirmations of fact and promises made to Plaintiffs and the Class regarding the Products became part of the basis of the bargain between Defendant and Plaintiffs and the Class, thereby creating an express warranty that the Products would conform to those affirmations of fact, representations, promises, and descriptions.

86. The Products do not conform to the express warranties because they are adulterated with pomace and thus cannot be labeled as olive oil.

87. Plaintiffs and members of the Class were injured as a direct and proximate result of Defendant's breach because (a) they would not have purchased the Products if they had known the truth about the Products' adulteration ; (b) they paid a price premium for the Products based on Defendant's express warranties; and (c) the Products did not have the characteristics, uses, or benefits as promised.

88. As a result, Plaintiffs and members of the Class have been damaged either in the full amount of the purchase price of the Products or in the difference in value between the Products as warranted and the Products as sold.

89. On February 13, 2026, Plaintiffs sent a notice letter to Defendant consistent with NY UCC § 2-607(3)(a) and U.C.C. 2-607(3)(A).

**COUNT IV**
**Fraud**
**(For all Classes)**

90. Plaintiffs hereby incorporate by reference and re-allege herein the allegations contained in all preceding paragraphs of this complaint.

91. Plaintiffs bring this claim individually and on behalf of members of the Class and New York Subclass against Defendant

92. Defendant affirmatively misrepresented to consumers that the Products were olive oil despite the fact the Products were adulterated with other oils and are not olive oil.

93. Defendant's misrepresentations are material to a reasonable consumer because it relates to the quality, safety, utility, and healthfulness of the Products. A reasonable consumer attaches importance to such representations and is induced to act thereon in making purchasing decisions with respect to oil that is consumed.

94. At all relevant times, Defendant knew that the representations were misleading. Defendant intended for Plaintiffs and other consumers to rely on the representations, as evidenced by Defendant intentionally and conspicuously placing the "100% Pure" and "Extra Virgin Olive Oil" representations on the packaging of the Products. In the alternative, Defendant acted recklessly in making the representations without regard to the truth.

95. Plaintiffs and members of the proposed Classes have reasonably and justifiably relied on Defendant's intentional misrepresentations when purchasing the Products, and had the correct facts been known, would not have purchased them at the prices at which they were sold in the market, or would not have purchased them at all.

96. Therefore, as a direct and proximate result of Defendant's intentional misrepresentations, Plaintiffs and members of the Classes have suffered economic losses and other general and specific damages, including but not limited to the price premium for the Products, and any interest that would have accrued on those monies, all in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment on behalf of themselves and members of the Class and New York Subclass as follows:

a. For an order certifying the nationwide Class and the New York Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representative of the Class and Subclass and Plaintiffs' attorneys as Class Counsel to represent the Class and Subclass members;

b. For an order declaring that Defendant's conduct violates the statutes referenced herein;

c. For an order finding in favor of Plaintiffs, the nationwide Class, and the Subclass on all counts asserted herein;

d. For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

e. For injunctive relief enjoining the illegals acts detailed herein;

f. For prejudgment interest on all amounts awarded;

g. For an order of restitution and all other forms of equitable monetary relief;

h. For an order awarding Plaintiffs and the Class and Subclass their reasonable attorneys' fees and expenses and costs of suit.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all claims so triable.

Dated: March 27, 2026 **BURSOR & FISHER, P.A.**

By: *<u>/s/ Yitzchak Kopel</u>*
Yitzchak Kopel

Yitzchak Kopel
Julian C. Diamond
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
Email: ykopel@bursor.com
jdiamond@bursor.com

**EATON & TORRENZANO, L.L.P.**
Craig A. Eaton
8416 3rd Ave
Brooklyn, New York 11209
Telephone (718) 332-7766
Facsimile (718) 332-5898
Email: ce1617@aol.com

*Attorneys for Plaintiffs*

# EXHIBIT A

lluís jané busquets
laboratori d'anàlisi s.l.

V.A.T. Id. B61817615
tel - fax 937211325
ljb@ljblab.com
www.ljblab.com

ENSAYO ISO 17025 Nº918 / LE1868

The analytical determinations and activities marked with a (*) are not included in the Enac accreditation scope.

Recognized by the Olive Oil Council International for analysis physical-chemical (01/12/24-30/11/25)

**Lluís Jané Busquets Laboratori d'Analisi S.L.**
c/ St Llorenç, 27 baixos 08192 Sant Quirze del Valles (Bcn)

GABINETE DE SERVICIOS PARA LA CALIDAD SLU
C/Caridad 32, Retiro
28007 - MADRID
MADRID

**Report Nº: 79655**

# ANALYSIS CERTIFICATE

## Sample Idenfication

| | | | |
|---|---|---|---|
| Reception date: | 18/02/2025 | Initial date Analysis: | 18/02/2025 |
| Final date analysis: | 23/04/2025 | Issue report date: | 24/04/2025 |
| Sample Nº: | 78650 | | |
| Sample description: | Oil contained in 250mL plastic bottle | | |

**Information provided by the client:**

| | |
|---|---|
| Sample: | OLIVE OIL |
| Reference: | Project NAOOA-2024 sample-276 |

***Sterol Composition+Total Sterol+ E+U***

| Determinations | Results | Procedure: | Method | Limit |
|---|---|---|---|---|
| **Cholesterol** | <0,1 % | COI T.20 DOC nº26 Rev. 5 | GC-FID | <=0,5 |
| **Brassicasterol** | <0,1 % | COI T.20 DOC nº26 Rev. 5 | GC-FID | <=0,1 |
| **24-Methylenecholesterol** | 1,0 % | COI T.20 DOC nº26 Rev. 5 | GC-FID | |
| **Campesterol** | 3,3 % | COI T.20 DOC nº26 Rev. 5 | GC-FID | <=4,0 |
| **Campestanol** | 0,1 % | COI T.20 DOC nº26 Rev. 5 | GC-FID | |
| **Stigmasterol** | 1,3 % | COI T.20 DOC nº26 Rev. 5 | GC-FID | <Campesterol |
| **Delta7-Campesterol** | <0,1 % | COI T.20 DOC nº26 Rev. 5 | GC-FID | |
| **Beta-sitosterol (apparent)** | 94,7 % | COI T.20 DOC nº26 Rev. 5 | GC-FID | >=93,0 |
| **Delta-7-Stigmastenol** | 0,4 % | COI T.20 DOC nº26 Rev. 5 | GC-FID | <=0,5 |
| **Delta-7-Avenasterol** | 0,2 % | COI T.20 DOC nº26 Rev. 5 | GC-FID | |
| **Total Sterol** | >3800 mg/kg | COI T.20 DOC nº26 Rev. 5 | GC-FID | >=1.000 |
| **Erythrodiol+Uvaol** | 21,8±1,4 % | COI T.20 DOC nº26 Rev. 5 | GC-FID | <=4,5 |

Registro Mercantil de Barcelona Tomo 31582 - Folio 73 Hoja B194757 - Inscripción 1ª C.I.F. B-61817615

Registered in Catalonia Agri-Food Laboratories Agriculture, Livestock, Fisheries and Food Department Register as an accredited laboratory in the oils and fats sector.
Registered in Catalonia Environmental Health, Food and Official Control Laboratories as an accredited laboratory with Nº918 / LE1868.

This analytical report corresponds only to the sample received and analyzed provided by the client.
The laboratory is not responsible for the sampling and the information provided by the client. Such information is not covered by accreditation.
The laboratory confidentially manages the information obtained or created during the performance of laboratory activities.
The results are considered the property of the client and must not be reproduced in whole or in partially without the written approval of the laboratory.

lluis jané busquets
laboratori d'anàlisi s.l.

V.A.T. Id. B61817615
tel - fax 937211325
ljb@ljblab.com
www.ljblab.com

ENSAYO ISO 17025 Nº918 / LE1868

The analytical determinations and activities marked with a (*) are not included in the Enac accreditation scope.

Recognized by the Olive Oil Council International for analysis physical-chemical (01/12/24-30/11/25)

**Report Nº: 79655**

# ANALYSIS CERTIFICATE

| Determinations | Results | Procedure: | Method | Limit |
|---|---|---|---|---|
| **Acidity** | 0,12 % Oleic Acid | COI T.20 DOC nº34 Rev. 1 | Volumetry | <=1,00 |
| **Peroxide Value** | 8,4 m.e.q. of O2 / kg oil | COI T.20 DOC nº35 Rev. 1 | Volumetry | <=15,0 |

***Absorbency in ultra-violet***

| Determinations | Results | Procedure: | Method | Limit |
|---|---|---|---|---|
| **K270** | 1,79±0,09 | COI T.20 DOC nº19 Rev. 5 | UV Spectrophotometry | <=1,15 |
| **Delta-k** | 0,16±0,06 | COI T.20 DOC nº19 in force | UV Spectrophotometry | <=0,15 |

***Fatty Acid Composition + Trans Isomers (Quantitative %)***

| Determinations | Results | Procedure: | Method | Limit |
|---|---|---|---|---|
| **Myristic Acid** | 0,02 % | COI T.20 DOC nº33 Rev. 1 | GC-FID | <=0,03 |
| **Palmitic Acid** | 12,10 % | COI T.20 DOC nº33 Rev. 1 | GC-FID | 7,00-20,00 |
| **Palmitoleic Acid** | 1,05 % | COI T.20 DOC nº33 Rev. 1 | GC-FID | 0,30-3,50 |
| **Heptadecanoic Acid** | 0,10 % | COI T.20 DOC nº33 Rev. 1 | GC-FID | <=0,40 |
| **Heptadecenoic Acid** | 0,15 % | COI T.20 DOC nº33 Rev. 1 | GC-FID | <=0,60 |
| **Stearic Acid** | 2,79 % | COI T.20 DOC nº33 Rev. 1 | GC-FID | 0,50-5,00 |
| **Oleic Acid** | 70,10 % | COI T.20 DOC nº33 in force | GC-FID | 55,00-85,00 |
| **Linoleic Acid** | 11,91 % | COI T.20 DOC nº33 Rev. 1 | GC-FID | 2,50-21,00 |
| **Arachidic Acid** | 0,49 % | COI T.20 DOC nº33 Rev. 1 | GC-FID | <=0,60 |
| **Linolenic Acid** | 0,73 % | COI T.20 DOC nº33 Rev. 1 | GC-FID | <=1,00 |
| **Eicosenoic Acid** | 0,30 % | COI T.20 DOC nº33 Rev. 1 | GC-FID | <=0,50 |
| **Behenic Acid** | 0,18 % | COI T.20 DOC nº33 in force | GC-FID | <=0,20 |
| **Lignoceric Acid** | 0,09 % | COI T.20 DOC nº33 Rev. 1 | GC-FID | <=0,20 |
| **Oleic Trans Isomers** | 0,17 % | COI T.20 DOC nº33 Rev. 1 | GC-FID | <=0,20 |
| **Linoleic and Linolenic Trans isomers** | 0,13 % | COI T.20 DOC nº33 Rev. 1 | GC-FID | <=0,30 |

***ECN 42 Triglyceride content***

| Determinations | Results | Procedure: | Method | Limit |
|---|---|---|---|---|
| **LLL** | 0,63 % | COI/T.20/DOC nº20 Rev. 4 | HPLC-RI | |
| **OLLn** | 0,33 % | COI/T.20/DOC nº20 Rev. 4 | HPLC-RI | |
| **PLLn** | 0,04 % | COI/T.20/DOC nº20 Rev. 4 | HPLC-RI | |
| **Real Content** | 1,00 % | COI/T.20/DOC nº20 Rev. 4 | HPLC-RI | |
| **Theoretical Content** | 0,71 % | COI/T.20/DOC nº20 Rev. 4 | GC-FID | |
| **Difference:ECN42(HPLC)and ECN42(theoretical)** | 0,29 % | COI/T.20/Doc. nº20 in force | GC-FID & HPLC-RI | <=I0,30I |

lluis jané busquets
laboratori d'anàlisi s.l.

V.A.T. Id. B61817615
tel - fax 937211325
ljb@ljblab.com
www.ljblab.com

ENSAYO
ISO 17025
Nº918 / LE1868

The analytical determinations and activities marked with a (*) are not included in the Enac accreditation scope.

Recognized by the Olive Oil Council International for analysis physical-chemical (01/12/24-30/11/25)

**Report Nº: 79655**

# ANALYSIS CERTIFICATE

| Determinations | Results | Procedure: | Method | Limit |
|---|---|---|---|---|
| **Wax Content (C40+C42+C44+C46)** | >400 mg/kg | COI/T.20/DOC. nº28 Rev. 4 | GC-FID | <=350 |

## LEGISLATION

International Olive Council Trade Standard for Olive Oils and Olive Pomace Oils COI/T.15/NC No. 3 Rev. 20

## Notes

As the client request this report is an extension of analysis of the report nº78650 of the same sample.

* The numerical result of Waxes is 3984 mg/Kg.
* The numerical result of Total sterol content is 4241 mg/Kg.

Technical Manager,
Anna Jané.

***Annex***



**EXHIBIT B**

lluís jané busquets
laboratori d'anàlisi s.l.

V.A.T. Id. B61817615
tel - fax 937211325
ljb@ljblab.com
www.ljblab.com

ENSAYO
ISO 17025
Nº918 / LE1868

The analytical determinations and activities marked with a (*) are not included in the Enac accreditation scope.

Recognized by the Olive Oil Council International for analysis physical-chemical (01/12/25-30/11/26)

**Lluís Jané Busquets Laboratori d'Analisi S.L.**
c/ St Llorenç, 27 baixos 08192 Sant Quirze del Valles (Bcn)

BURSOR & FISHER, P.A.
1330 Avenue of the Americas, 32nd Floor
New York

**Report Nº: 86106**

# ANALYSIS CERTIFICATE

## Sample Idenfication

| | | | |
|---|---|---|---|
| Reception date: | 23/02/2026 | Initial date Analysis: | 23/02/2026 |
| Final date analysis: | 27/02/2026 | Issue report date: | 27/02/2026 |
| Sample Nº: | 86106 | | |
| Sample description: | Aceite contenido en una lata de 2L | | |

**Information provided by the client:**

| | |
|---|---|
| Sample: | EXTRA VIRGIN OLIVE OIL |
| Reference: | CAPATRITI Extra Virgin Olive Oil the honest olive oil, LOT #BF040225 TK32 01138 , BB: 04/02/2027 |

### *Fatty Acid Composition + Trans Isomers (Quantitative %)*

| Determinations | Results | Procedure: | Method | Limit |
|---|---|---|---|---|
| **Myristic Acid** | 0,01 % | COI T.20 DOC nº33 Rev. 1 | GC-FID | <=0,03 |
| **Palmitic Acid** | 10,75 % | COI T.20 DOC nº33 Rev. 1 | GC-FID | 7,00-20,00 |
| **Palmitoleic Acid** | 1,01 % | COI T.20 DOC nº33 Rev. 1 | GC-FID | 0,30-3,50 |
| **Heptadecanoic Acid** | 0,07 % | COI T.20 DOC nº33 Rev. 1 | GC-FID | <=0,40 |
| **Heptadecenoic Acid** | 0,11 % | COI T.20 DOC nº33 Rev. 1 | GC-FID | <=0,60 |
| **Stearic Acid** | 3,64 % | COI T.20 DOC nº33 Rev. 1 | GC-FID | 0,50-5,00 |
| **Oleic Acid** | 76,66 % | COI T.20 DOC nº33 Rev. 1 | GC-FID | 55,00-85,00 |
| **Linoleic Acid** | 6,07 % | COI T.20 DOC nº33 Rev. 1 | GC-FID | 2,50-21,00 |
| **Arachidic Acid** | 0,47 % | COI T.20 DOC nº33 Rev. 1 | GC-FID | <=0,60 |
| **Linolenic Acid** | 0,72 % | COI T.20 DOC nº33 Rev. 1 | GC-FID | <=1,00 |
| **Eicosenoic Acid** | 0,29 % | COI T.20 DOC nº33 Rev. 1 | GC-FID | <=0,50 |
| **Behenic Acid** | 0,13 % | COI T.20 DOC nº33 Rev. 1 | GC-FID | <=0,20 |
| **Lignoceric Acid** | 0,06 % | COI T.20 DOC nº33 Rev. 1 | GC-FID | <=0,20 |
| **Oleic Trans Isomers** | 0,02 % | COI T.20 DOC nº33 Rev. 1 | GC-FID | <=0,05 |
| **Linoleic and Linolenic Trans isomers** | 0,02 % | COI T.20 DOC nº33 Rev. 1 | GC-FID | <=0,05 |

Registro Mercantil de Barcelona Tomo 31582 - Folio 73 Hoja B194757 - Inscripción 1ª C.I.F. B-61817615

Registered in Catalonia Agri-Food Laboratories Agriculture, Livestock, Fisheries and Food Department Register as an accredited laboratory in the oils and fats sector.
Registered in Catalonia Environmental Health, Food and Official Control Laboratories as an accredited laboratory with Nº918 / LE1868.

The results of the analyzed physicochemical parameters have not been corrected with recovery factors.
This analytical report corresponds only to the sample received and analyzed provided by the client.
The laboratory is not responsible for the sampling and the information provided by the client. Such information is not covered by accreditation.
The laboratory confidentially manages the information obtained or created during the performance of laboratory activities.
The results are considered the property of the client and must not be reproduced in whole or in partially without the written approval of the laboratory.

lluis jané busquets
laboratori d'anàlisi s.l.

V.A.T. Id. B61817615
tel - fax 937211325
ljb@ljblab.com
www.ljblab.com

ENSAYO
ISO 17025
Nº918 / LE1868

The analytical determinations and activities marked with a (*) are not included in the Enac accreditation scope.

Recognized by the Olive Oil Council International for analysis physical-chemical (01/12/25-30/11/26)

**Report Nº: 86106**

# ANALYSIS CERTIFICATE

| Determinations | Results | Procedure: | Method | Limit |
|---|---|---|---|---|
| ***Sterol Composition+Total Sterol+ E+U*** | | | | |
| **Cholesterol** | <0,1 % | COI T.20 DOC nº26 Rev. 5 | GC-FID | <=0,5 |
| **Brassicasterol** | <0,1 % | COI T.20 DOC nº26 Rev. 5 | GC-FID | <=0,1 |
| **24-Methylenecholesterol** | 0,1 % | COI T.20 DOC nº26 Rev. 5 | GC-FID | |
| **Campesterol** | 3,9 % | COI T.20 DOC nº26 Rev. 5 | GC-FID | <=4,0 |
| **Campestanol** | 0,1 % | COI T.20 DOC nº26 Rev. 5 | GC-FID | |
| **Stigmasterol** | 0,8 % | COI T.20 DOC nº26 Rev. 5 | GC-FID | <Campesterol |
| **Delta7-Campesterol** | <0,1 % | COI T.20 DOC nº26 Rev. 5 | GC-FID | |
| **Beta-sitosterol (apparent)** | 94,4 % | COI T.20 DOC nº26 Rev. 5 | GC-FID | >=93,0 |
| **Delta-7-Stigmastenol** | 0,3 % | COI T.20 DOC nº26 Rev. 5 | GC-FID | <=0,5 |
| **Delta-7-Avenasterol** | 0,3 % | COI T.20 DOC nº26 Rev. 5 | GC-FID | |
| **Total Sterol** | 1.520 mg/kg | COI T.20 DOC nº26 Rev. 5 | GC-FID | >=1.000 |
| **Erythrodiol+Uvaol** | 4,9±0,3 % | COI T.20 DOC nº26 Rev. 5 | GC-FID | <=4,5 |

| | | | | |
|---|---|---|---|---|
| **Difference:ECN42(HPLC)and ECN42(theoretical)** | 0,02 % | COI T.20 DOC nº20 Rev. 4 | GC-FID & HPLC-RI | <=I0,20I |
| **Stigmasta-3,5-diene** | 0,11±0,03 mg/kg | COI T.20 DOC nº11 Rev. 4 | GC-FID | <=0,05 |
| **Wax Content (C42+C44+C46)** | 72 mg/kg | COI T.20 DOC. nº28 Rev. 4 | GC-FID | <=150 |
| **2-Glyceryl monopalmitate** | 0,5 % | COI T.20 DOC nº23 Rev. 1 | GC-FID | <=0,9 |

## LEGISLATION

International Olive Council Trade Standard for Olive Oils and Olive Pomace Oils COI/T.15/NC No. 3 Rev. 21

Technical Manager,
Anna Jané.

lluis jané busquets
laboratori d'anàlisi s.l.

ljb laboratori

V.A.T. Id. B61817615
tel - fax 937211325
ljb@ljblab.com
www.ljblab.com

ENAC
ENSAYO
ISO 17025
Nº918 / LE1868

The analytical determinations and activities marked with a (*) are not included in the Enac accreditation scope.

Recognized by the Olive Oil Council International for analysis physical-chemical (01/12/25-30/11/26)

**Report Nº: 86106**

# ANALYSIS CERTIFICATE

| Determinations | Results | Procedure: | Method | Limit |
|---|---|---|---|---|

***Annex***



lluis jané busquets
laboratori d'anàlisi s.l.

V.A.T. Id. B61817615
tel - fax 937211325
ljb@ljblab.com
www.ljblab.com

ENSAYO
ISO 17025
Nº918 / LE1868

The analytical determinations and activities marked with a (*) are not included in the Enac accreditation scope.

Recognized by the Olive Oil Council International for analysis physical-chemical (01/12/25-30/11/26)

**Report Nº: 86106**

# ANALYSIS CERTIFICATE

| Determinations | Results | Procedure: | Method | Limit |
|---|---|---|---|---|

***Annex***




Registered in Catalonia Agri-Food Laboratories Agriculture, Livestock, Fisheries and Food Department Register as an accredited laboratory in the oils and fats sector.
Registered in Catalonia Environmental Health, Food and Official Control Laboratories as an accredited laboratory with Nº918 / LE1868.

The results of the analyzed physicochemical parameters have not been corrected with recovery factors.
This analytical report corresponds only to the sample received and analyzed provided by the client.
The laboratory is not responsible for the sampling and the information provided by the client. Such information is not covered by accreditation.
The laboratory confidentially manages the information obtained or created during the performance of laboratory activities.
The results are considered the property of the client and must not be reproduced in whole or in partially without the written approval of the laboratory.

lluís jané busquets
laboratori d'anàlisi s.l.

V.A.T. Id. B61817615
tel - fax 937211325
ljb@ljblab.com
www.ljblab.com

ENSAYO
ISO 17025
Nº918 / LE1868

The analytical determinations and activities marked with a (*) are not included in the Enac accreditation scope.

Recognized by the Olive Oil Council International for analysis physical-chemical (01/12/25-30/11/26)

**Report Nº: 86106**

## ANALYSIS CERTIFICATE

| Determinations | Results | Procedure: | Method | Limit |
|---|---|---|---|---|

***Annex***

